IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

Wilbert Washington,

    Plaintiff,

v.                                         Case No. 4:21-cv-00587-HFS

Advantage Metals Recycling, LLC,

    Defendant.

**ORDER**

Plaintiff Wilbert Washington brings race and age discrimination claims against his former employer, Advantage Metals Recycling, LLC ("AMR") pursuant to the Missouri Human Rights Act. (Doc. 1). AMR has filed a motion for summary judgment on all claims, arguing that Washington has failed to meet his burden of showing either age or race discrimination, and that it is entitled to summary judgment. (Doc.43).

**Summary Judgment Standard.**

Summary judgment is appropriate if the moving party demonstrates there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of informing the court of the basis for its motion. Solis v. Contingent Care, LLC, 2013 WL 12205693, at *1 (W.D. Mo.)(citing Celotex Corp. v.

1

Catrett, 467 U.S. 317, 323 (1986)).  To avoid summary judgment, the nonmoving party must set forth specific facts showing a genuine issue for trial. Id. (citing Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997)).  In deciding whether to grant summary judgment, the Court must view all facts in a light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences drawn from the facts.  Robinson v. Monaghan, 864 F.2d 622, 624 (8th Cir. 1989).

At the summary judgment stage, the movant must support its motion either by citing to the record or by showing that there is an absence of evidence to support the nonmoving party's case.  Celotex v. Catrett, 477 U.S. 317, 325 (1986); Fed R. Civ P. 56 ( c). In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue for trial exists.  Fed. R. Civ. P. 56 ( c). In so doing, the nonmoving party cannot create sham issues of fact in an effort to defeat summary judgment.  RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995).

**Background Facts.**

Both parties have provided their own version of facts. (Docs. 44, 47, 54). For the most part, the parties have disputed almost every fact set forth by the other.  Many of the "disputes" are either immaterial or not necessary to resolve for the purpose of this order. With these limitations in mind and for ease of

reference, the general background facts are set forth below, disputed facts will be discussed as necessary. As this is a motion for summary judgment, all facts will be viewed in the light most favorable to Washington.

**Washington's Employment with AMR.**

AMR hired Washington, who is black, in 2011 as part of its Management Training Program. (Doc. 47 ¶1). In 2013, Washington transferred to its Manchester, Missouri facility as a salaried supervisor. (Doc. 47 ¶3). Washington supervised the extraction department and was responsible for personnel, material, equipment, shipment of materials, and maintenance of the department. (Doc. 44-1, p. 5). Washington supervised eight to ten employees (most of whom were Hispanic according to Keith Litle. (Doc. 44-6, Litle Depo. at 47). His department produced recycled materials, which were shipped and sold. (Doc. 44-1, p.5). During his tenure, Washington changed managers multiple times. (Doc. 54 ¶3).

In 2016, AMR's executive leadership team was replaced. (Doc. 54 ¶9). The new leadership team emphasized increasing production and encouraged managers to ship materials out as soon as they were ready. (Doc. 54 ¶¶15,16). This was a change from prior procedures where the sales team would tell managers when to ship. (Doc. 54, ¶ 13). Under the new management and procedures, Washington was responsible for forecasting and scheduling shipments. (Doc. 47 ¶¶13, 14). Plaintiff estimated that he began being

responsible for shipments in 2018 or the beginning of 2019. (Doc. 54 ¶13, 14). Washington agreed that the new management team emphasized the need to keep up with production and have materials ready to ship. (Doc. 54 ¶16).

**Washington's Performance Reviews.**

Plaintiff was rated "effective" and "outstanding" in different components of his 2015 and 2016 performance reviews. (Doc. 44-1, p. 27-43) (Doc. 54 ¶¶ 20-22). The reviews were positive, complimenting Washington's work effort and ability to manage employees. (Id.). In 2018, Washington also received "effective" ratings on his performance reviews. (Doc. 44-1, p. 44-59). This evaluation was also favorable: "Wilbert is a good teammate to have on your team. He is always willing to help when and wherever needed . . .". (Doc. 44-1, p. 50). On July 31, 2019, Keith Litle (terminated with plaintiff) gave Washington his 2019 mid-year review, issuing "effective" ratings in five out of the six annual goals and "outstanding" in the area of Personnel Development/Retention. (Doc. 54 ¶45). (Litle Depo. at Ex. 9).

**Complaints about Washington.**

AMR provided evidence that management noticed that Washington was not complying with the new shipping procedures and had problems "leaving product on the ground." (Doc. 54 ¶47). Washington acknowledged that the new

management team emphasized shipping product out as soon as possible which was a change from prior procedures. (Doc. 54, ¶¶47-50).

Several of the AMR employees testified that Washington had a general "pushback" about the change in shipping procedures. Dale Shaw, Operations Manager, and Joshua Jones, Facility Manager for the Manchester Facility, both stated that plaintiff had some "general push back" on the new shipping procedures. (Doc. 47 ¶17) (Doc. 54 ¶¶17, 19). Joshua Jones, Facility Manager for Manchester from January 2016 to the spring of 2017, testified about performance issues he experienced with Washington, including being "habitually late" on paying invoices, and failing "to properly report and forecast consistently." He also stated that Washington was late or failed to show at meetings. (Doc. 54 ¶¶18, 19).

Joseph Covell, the Manager of Manchester from April 2018 to sometime in 2019, also noted that Washington had problems with forecasting sales and scheduling shipments, and that he addressed these concerns during staff meetings. (Doc. 54 ¶28) (Doc. 47-5, Covell Depo. at 10-12). On June 17, 2019, Covell sent an email to Plaintiff about discrepancies between inventory and forecasts. (Doc. 54 ¶71).

In 2019, Brad Pederson became a General Manager responsible for the Manchester facility. (Doc. 54-2, Ex. B Pederson Depo. at 6). Pederson was the direct supervisor of Keith Litle, and Litle was the direct supervisor of Washington. (Ex. 4 Pederson Depo. at 6-7). Pederson was frustrated with Litle and

5

Washington because Washington had delays in shipping materials. (Doc. 54-2, Pederson Depo. at 11). Pederson stated that Washington accumulated his inventory toward the end of the month and then shipped it all out the last week of the month so that he could give his team downtime earlier in the month. (Doc. 54-2, Pederson Depo. at 12).

A September 6, 2019, email from Dan Scropos to Washington (copied to Brad Pederson and Keith Litle) emphasized that "the new team strongly encourages us to get material out the door when it's ready . . . and that its worth reiterating." (Doc. 54-1, p. 14). The email further stated that Washington had not loaded any containers in two weeks and that requests for containers were a week late. (Doc. 54-1, p. 14). General Manager Pederson complained also that Washington failed to pay an invoice on time resulting in AMR being unable to order from the vendor. (Doc. 54 ¶¶ 36-40) He also testified as to inventory being not shipped on a timely basis so that the materials had to be sold at a lower price. (Doc. 54 ¶¶ 54, 55).

Brenda Brumbaugh, Director of Human Resources, testified in her deposition that there were ongoing production issues within Washington's department. (Doc. 44-3, Brumbaugh Depo. at 30). She testified that Washington was counseled on a "fairly continuous" basis from the summer of 2016 until his termination. (Doc. 44-3, Brumbaugh Depo at 44). Brumbaugh also discussed an incident involving time keeping. (Doc. 44-3, Brumbaugh Depo. at 14). She stated that she was told that Washington was entering time keeping system manually rather than letting the punches come from the time clock. In this way, he was

6

accumulating hours for his workers every week and then punching them in and out of Fridays, even though they were not actually working. (Doc. 44-3, Brumbaugh Depo. at 14). Washington denies that he was entering time records for his employees and suggests that there was a misunderstanding of the shift differential to be paid to employees. (Doc. 54 ¶41). Washington was not formally disciplined for this alleged incident. (Doc. 54 ¶43).

The parties agree that AMR did not have a formal or progressive discipline policy for supervisors or managers. (Doc. 54 ¶6). Instead, AMR would engage in discussions with salaried employees. (Doc. 54 ¶8).

**Washington's Termination.**

Pederson also had concerns with Washington's supervisor, Keith Litle, testifying that he was not a strong manager and was not effectively managing Washington. (Doc. 54-2, Pederson Depo. at 41). Ultimately, when the profitability of the operations fell in the first four months of 2019, Pederson recommended that both Washington and Litle be terminated. (Doc. 54-2 ).(Doc. 47 ¶80). The executive team, including Brenda Brumbaugh, Dale Shaw, and Jeff Davis, considered Pederson's recommendation and approved it. (Doc. 47 ¶84) Washington was terminated on October 14, 2019, and was 48 years old at the time of his termination. (Doc. 47 ¶¶ 80, 91).

Some months before plaintiff's termination, he had an argument with another supervisor, Rene Morin, that became a significant issue with Pederson,

7

along with the perceived delayed shipping issue and the delayed invoice payment controversy. The first and last were one-time issues. The weekly shipping issue was claimed by plaintiff to be a new requirement in 2019, and in discussion with Pederson, told him that Pederson did not understand plaintiff's team and should not instruct whether to ship in the first week of the month or not. (Doc. 44-2, Pederson Depo. at 19).[1]

After plaintiff was terminated, Rene Morin (Caucasian male, born in 1967) initially assumed plaintiff's job responsibilities. (Doc. 47 ¶ 88). Nathan Strickland, (Caucasian male in his 20's) an operations management trainee, assisted Morin with some of plaintiff's job responsibilities. (Doc. 47 ¶88). More than a year later, in 2021, Amanda Schoolcraft (Caucasian female in her 30's) was promoted to the supervisor position and assumed plaintiff's job responsibilities. (Doc. 47 ¶¶ 88,89)

Washington filed this action alleging age and race discrimination. AMR's motion for summary judgment followed.

**Legal Standard.**

A claim of unlawful discrimination may be established through direct or indirect evidence. Because Plaintiff's claim is not based on any direct evidence of discrimination by comments or actions, the Court will apply the *McDonnell*

---

[1] This Pederson recollection is cited in AMR's Reply Brief. (Doc. 54, ¶48). The untimely citation could have induced a sur-reply, with an affidavit contesting it. It remains unchallenged as sworn testimony.

*Douglas* burden-shifting analysis. Mo. Rev. Stat. § 213.101.3 (stating "the court shall consider the burden-shifting analysis of McDonnell Douglas ... to be highly persuasive for analysis in cases not involving direct evidence of discrimination.").

When deciding a case under the MHRA, courts are guided by Missouri law and federal employment discrimination case law consistent with Missouri law. Lampley v. Mo. Comm'n on Hum. Rts., 570 S.W.3d 16, 22 (Mo. banc 2019). Under the *McDonnell Douglas* burden-shifting framework, Plaintiff must first demonstrate a *prima facie* case of discrimination; then the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the challenged action; finally, if Defendant offers such a reason, the burden shifts back to Plaintiff to show the proffered reason is merely a pretext for discrimination. Eivins v Missouri Dept of Corrections, 636 S.W.3d 155,166–67 (Mo. App. W.D. 2021). If Plaintiff fails to make a *prima facie* case, the Court grants summary judgment. Id.

The Court views any factual disputes in the light most favorable to Plaintiff, Scott v. Harris, 550 U.S. 372, 380 (2007), and will grant summary judgment only if evidence could not support any reasonable inference for Plaintiff. Hilde v. City of Eveleth, 777 F.3d 998, 1004 (8th Cir. 2015). Despite this deferential standard, Plaintiff will not withstand summary judgment with "[m]ere allegations, unsupported by specific facts or evidence beyond [her] own conclusions." Thomas v. Corwin, 483 F.3d 516, 526 (8th Cir. 2007); Bram v. AT&T Mobility Servs., LLC, 564 S.W.3d 787, 799 (Mo. Ct. App. 2018) (explaining an "inference" of discrimination is not raised by a "plaintiff's general, conclusory

allegations and opinions") (quoting Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 570 (8th Cir. 2000)).

**Prima Facie Case of Discrimination.**

Plaintiff admits that he does not have direct evidence of either race or age discrimination. Therefore, he must advance his claims under the McDonnell Douglas framework. Lewis v. Southwestern Bell Tel. Co., 2022 WL 891630, at * 6 (W.D. Mo.)(quoting Bunch v. Univ. of Arkansas Bd. of Trustees, 863 F.3d 1062, 1068 (8th Cir. 2017)).

"To establish a prima facie case of discrimination [under the MHRA], a plaintiff must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." Id. *15-16 (quoting Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011)). "If the plaintiff satisfies the prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory justification for its adverse action." Id. (quoting Bunch 863 F.3d 1062, 1068). "If the employer meets this burden, the plaintiff must prove [the employer's] justification is a mere pretext for discrimination." Id. (citation and quotations omitted) (alteration in original)). Nelson v. Elmo Bank, 2023 WL 4876450, at * 2 (8th Cir. 2023).

Here, both parties agree that Washington was a member of a protected class and that he suffered an adverse employment action. AMR argues that it is entitled to summary judgment because Washington was not meeting his employer's legitimate expectations. AMR further argues that even if Washington can establish a prima facie case of either age or race discrimination it is still entitled to summary judgment because it has provided a legitimate nondiscriminatory reason for Washington's termination and plaintiff has failed to prove that the reason is pretext for discrimination.

**AMR's Legitimate Expectations.**

AMR argues that Washington was not meeting its legitimate expectations. AMR points to evidence that Washington had repeated performance issues that were addressed from 2015 until the time of his discharge. (Doc. 54, p. 66-68).

Although the question is close, when the evidence is viewed in the light most favorable to Washington, I conclude that there is a dispute of fact as whether Washington was generally meeting his employer's legitimate expectations. The Pederson intervention in 2019 is the main event that suggests the contrary.

First, Washington has produced performance evaluations which, for the most part, are favorable and complimentary of Washington. (Doc. 47, Exhibits 9 10, 11, 12).

11

Second, Washington provides a plausible explanation for some of the complaints made by AMR. For example, Washington acknowledged that Manager Jones criticized him for being late to meetings, but he points to his testimony that he was late to meetings because of issues such as a breakdown of equipment. (Doc. 54 ¶ 19). With respect to the September 6, 2019, email where it was stated that Washington was shipping product late, Washington explained that he still understood that the goal to ship was on a monthly basis and that until he received the email from Scropos he did not understand that the goal was to ship on a weekly basis. (Doc. 54 ¶49). He also explained that there are many variables in shipping and that there is a shared responsibility to ship material when ready. (Doc. 54 ¶51). As to the time-keeping incident, Washington testified that he was unaware of the shift differential issue, and he points out that he was not disciplined for this incident. He also acknowledged that he was late in paying an invoice, but explains that there was a dispute as to certain charges and that after settling the issue, he saved the company $30,000. (Doc. 54 ¶26). When the evidence is viewed in the light most favorable to Washington, there is probably a dispute of fact as to whether Washington was meeting the legitimate expectations of AMR.

If this were simply a wrongful discharge case, there would be an issue to try. But there is little or no showing that Pederson knew and understood plaintiff's current contentions. It is therefore somewhat unrealistic to conclude that AMR's expectations for plaintiff's performance were being satisfied, but I do

12

so arguendo. However, even if plaintiff depicts an impatient manager who holds grudges that does not conclusively advance his cause here. [2]

**Inference of Discrimination and Pretext.**

Washington does not dispute that AMR offered a legitimate explanation for his termination. Thus, the question becomes whether the circumstances allow an inference of racial or age discrimination and, if so, whether the reason offered by AMR is pretext for such discrimination.

Evidence of pretext, normally shown at step three of the <u>McDonnell Douglas</u> analysis can satisfy the inference of discrimination element of the prima facie case. <u>Nelson</u>, 2023 WL 4876450, at * 5 (*citing* <u>Lake v. Yellow Trans. Inc.,</u> 596 F.3d 871, 874 (8th Cir. 2010)). Thus, AMR combines these two theories and states that it is entitled to summary judgment because (1) there is no evidence to support an inference of discrimination; and (2) there is no evidence that the termination decision was pretext for discrimination.

To show pretext, an employee must show that an employer: (1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner; or (3) shifted its explanation of the employment decision. <u>Lake v. Yellow Trans. Inc.,</u> 596 F.3d 871, 874 (8th Cir. 2010). As to whether an employer's proffered reason had a legitimate basis in fact, "[t]he critical inquiry . . . is not

---

[2] This would suggest a dangerous trial for AMR. If a jury believed that there was a wrongful termination it might be difficult to achieve exclusive jury deliberation on age (or race) discrimination issues.

whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." McCullough v. Univ. of Ark. for Med. Sciences, 559 F.3d 855, 861-62 (8th Cir. 2009). A plaintiff may demonstrate a material question of fact regarding pretext by showing that the employer's explanation is unworthy of credence or that a prohibited reason more likely motivated the employer. Gardner v Wal-Mart Stores, 2 F.4th 745, 749 (8th Cir. 2021).

Washington does not directly refute that AMR terminated him for perceived performance problems summarized in the Pederson deposition. (Doc. 44-2; Doc. 54-2). Instead, he asserts that he can show an inference of discrimination as well as pretext because he was treated differently than younger, Caucasian employees. Washington points to other employees who replaced him following his discharge: Rene Morin (Caucasian, born 1967), Nathan Strickland (Caucasian, in his 20's) (Doc. 54, p. 84, 85), and ultimately Schoolcraft (Caucasian in her 30's). (Doc. 47, p. 67-68). He also emphasizes that AMR's population of supervisors, managers, and executives consists predominantly of Caucasian males. (Doc. 47, p. 43).

Rene Morin temporarily assumed Plaintiff's job duties in addition to his own. (Doc. 54 ¶89). Spreading a plaintiff's duties on the remaining employees does not amount to replacement and does not support a reasonable inference of discrimination. See Otto v. City of Victoria, 685 F.3d 755, 759-60 (8th Cir. 2012) (even though younger workers assumed plaintiff's duties after discharge alone

14

cannot support a reasonable inference of age discrimination.) Moreover, Nathan Strickland was a management trainee who briefly performed some of the duties that plaintiff had performed. (Doc. 54 ¶88).  A  management trainee is not a replacement and assuming some of his duties even if he was younger, does not support an inference of age discrimination.  See Gilmore v. At & T, 319 F.3d 1042, 1046 (8th Cir. 2003) ( individuals used as comparators must have dealt with same supervisor and subject to same standard and engaged in same conduct). As far as plaintiff's uncontested statement that the supervisors, managers, and executives consist of predominately Caucasian males, this does not by itself support any inference of discrimination, certainly not instigated by Pederson, the **decision-maker** here.

As stated, Washington does not directly refute AMR's reasons for discharge as poor performance.  Instead, he asserts that he was treated differently than Caucasian employees because Caucasian employees with performance problems were  allowed a lateral transfer or demotion and were not terminated.   (Doc. 47  ¶108) (Doc. 47-1 p. 77). He argues that this evidence shows an inference of discrimination as well as pretext.  As examples, he cites employees Keith Litle (Caucasian male, 60's); Steve Brown (Caucasian male, 50's); William McBride (Caucasian male, 30s); Phillip Shepard (Caucasian male, 30s); and Norman Hicklin (Caucasian male, 30s).  Washington states that the consequences for underperformance to these Caucasian employees was a transfer or demotion and that this evidence of different treatment supports an inference of discrimination. (Doc. 47-1 p. 79).

The evidence cited by plaintiff does not create a question of fact as to whether Caucasian employees were treated differently. The test is rigorous and requires the other employees to be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing himself to the other employees. Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008) ("when different decision makers are involved, two decisions are rarely similarly situated in relevant respects"). See Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 956 (8th Cir. 2012) ("[I]ndividuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."). Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014) (en banc), *quoting* Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (alteration in original). The offenses must be "of the same or comparable circumstances and plaintiff does not elaborate on the performance problems for the comparators. See Said v Mayo Clinic, 2022 WL 1142 (8th Cir. 2022). Accord Nelson, 2023 WL 4876450, at * 12 (8th Cir.) (reiterating the "rigorous" standard for showing instances of disparate treatment to support claim of pretext).

Furthermore, the evidence that these comparable employees were demoted or transferred for performance issues is contested. For example, the suggestion that Litle faced prior demotions is controverted and is further diminished by the undisputed evidence that Litle was terminated at the same time as Washington for performance problems. Litle testified that he was

16

transferred to a smaller yard and he viewed it as a demotion. (Doc. 47-7 Litle Depo at 68). However, he acknowledged that his pay was not reduced and he was told the transfer was for his benefit in the long run. (Id.). Washington fails to identify the supervisors of the named comparators or allege that the comparators held the same positions. Indeed, other evidence suggests that these employees were not in comparable positions and did not report to Pederson. (Doc. 54 p. 70-71). No inference of discrimination can be had where plaintiff does not identify similarly situated co-workers who were treated differently. Shirrell v. St. Francis Med. Ctr., 793 F.3d 881, 887-88 (8th Cir. 2015).

Washington primarily relies on his positive performance evaluations as evidence to support an inference of discrimination. He argues that in light of these evaluations, the only explanation for his termination must have been discrimination. Although a history of positive performance evaluations can be powerful evidence of satisfactory performance, employers may choose to rely on recent performance more heavily than past performance. Gardner, 2 F.4th at 750. The performance reviews date back to 2015 and it is also noted that the most recent review was written by Keith Litle, who was also terminated for performance issues at the same time as Washington. Even when viewing the evidence and inferences in the light most favorable to Washington, the Court finds that there is not a genuine issue of material fact to support an inference of discrimination.

There is more plausible evidence of age rather than race discrimination but that relates to Litle. Litle testified that "new college grads" were brought in by

17

new management (Doc. 44-6, Litle Depo. at 95) and that he was part of the "old school," "old guard," or "old managers." (Doc. 44-6, Litle Depo. at 133-34). But Litle said he was not referring to age, but rather to those who "still like the old ways of doing things." (Doc. 44-6, Litle Depo. at 134-35). Plaintiff does not argue that AMR linked his performance issues to his age. To argue otherwise would make all performance issues of employees over 40 subject to trial as potential age discrimination.

A plaintiff may demonstrate a material question of fact regarding pretext by showing that the employer's explanation is unworthy of credence or that a prohibited reason more likely motivated the employer. Gardner, 2 F.4th at 49. But an honest belief is enough to exonerate an employer – the belief need not be correct. See cases cited in Pye, supra, 641 F.3d at 1022.

AMR has provided a legitimate explanation under oath for the termination and plaintiff has not pointed to evidence to create an issue of fact to show that AMR's reason was unworthy of credence. Indeed, Washington acknowledges that none of his supervisors ever did or said anything that would indicate a bias against him. (Doc. 47-1, Little Depo at 50, 77, 78,79). Washington only suggests that in light of his performance evaluations, it must be that a prohibited reason more likely was the motivation. See Brown v. McDonnell Douglas Corp., 936 F.Supp. 665, 671 (E.D.Mo.) (previous positive evaluations not probative on issue of pretext).

AMR's proffered reasons are well supported by evidence in the record. There is substantial evidence that Washington was terminated for perceived performance issues and that Pederson believed that Washington was not meeting expectations. See <u>Fiero</u> 759 F. 3d at 878 (Summary judgment appropriate when plaintiff failed to show that decisionmaker did not honestly believe performance deficient). Plaintiff, therefore, has not demonstrated that a prohibited reason likely motivated his termination decision. Plaintiff's claims fail under the MHRA and Defendant is therefore entitled to summary judgment.

Accordingly, it is hereby ORDERED that Defendant's motion for summary judgment is hereby GRANTED. (Doc.43).

SO ORDERED.

*/s/ Howard F. Sachs*
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

Dated: September 12, 2023
Kansas City, Missouri

19

Case 4:21-cv-00587-HFS   Document 61   Filed 09/12/23   Page 19 of 19